IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re BLOCKBUSTER INC.
SECURITIES LITIGATION

§
§
§
§
§
§
§
§

3:03-CV-0398-M (LEAD)

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Amended and Consolidated Complaint, filed on September 22, 2003. The Court grants Defendants' Motion. The Court dismisses Plaintiffs' Consolidated Amended Complaint, partially with prejudice and partially without prejudice.

## I. BACKGROUND

This is a federal securities class action on behalf of those who purchased Blockbuster securities between February 12, 2002 and December 17, 2002 (the "Class Period"). On December 18, 2002, Blockbuster announced that it would fall short of its prior projections for the fiscal year and fourth quarter of 2002. After this announcement, the price of Blockbuster common stock closed at $13.64 per share, compared to the closing price of $19.40 per share on December 17, 2002.

Plaintiffs bring suit for securities fraud under Section 10(b) of the Securities Exchange Act, and Rule 10b-5, against Blockbuster and John Antioco, Larry Zine, and Nigel Travis (the "Individual Defendants"). In addition, Plaintiffs bring suit under Section 20(a) of the Securities

1

Exchange Act against the Individual Defendants, as control persons of Blockbuster. Plaintiffs' allegations of fraud fall into six general categories.

The first category is premised on Blockbuster's alleged failure to disclose, and failure to recognize as a contingent liability, its dispute with Buena Vista Home Entertainment ("Buena Vista"). On December 31, 2002, Buena Vista, a division of Disney, filed suit against Blockbuster, alleging that Blockbuster had breached the terms of their revenue sharing agreement, and seeking more than $120 million in damages. Plaintiffs contend that Defendants knew about the dispute with Buena Vista no later than June 20, 2001, and that Defendants should have disclosed the dispute and treated it as a contingent liability in Blockbuster's financial statements.

The second category is premised on Defendants' alleged fraudulent scheme to hide the losses associated with destroying Blockbuster's VHS inventory. On September 10, 2001, Blockbuster announced a merchandising campaign to destroy 25% of its VHS inventory in order to make room for DVDs. Blockbuster announced that the merchandising campaign was completed in 2001. However, Plaintiffs contend that the merchandising campaign was internally referred to as the Merchandise Opportunity Program ("MOP") and that MOP actually continued into 2002. Plaintiffs further contend that the financial statements for the first half of 2002 were inaccurate, because they did not take into account the costs of the continuing VHS destruction. Although the costs associated with the destruction of VHS inventory would ordinarily have been reflected in Blockbuster's financial statements as merchandise rental costs, Plaintiffs allege that the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs. Plaintiffs additionally allege

2

that "shrink," which Blockbuster explained was the reason for the increase in merchandise sales costs, was a false explanation.

The third category is premised on Defendants' alleged misrepresentations and omissions relating to whether competition from mass merchants was hurting Blockbuster's business. According to Plaintiffs, the swing from DVD to VHS caused consumers to more frequently purchase, rather than rent, DVDs. Mass merchants sell DVDs for virtually no profit, as a way to attract consumers into their stores, thus hurting Blockbuster's sales of DVDs. Plaintiffs contend that Defendants misrepresented and failed to disclose the effect of this phenomenon on Blockbuster's business.

Fourth, Plaintiffs allege that Defendants misrepresented that the gross profit margin on DVD rentals was 70%, when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals was 10 percentage points higher than the gross profit margin on VHS rentals when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher.

Fifth, Plaintiffs allege that Defendants misrepresented that Blockbuster was not experiencing problems with its inventory and distribution technology, and that they failed to disclose the actual problems Blockbuster was experiencing with that technology.

Finally, Plaintiffs allege that, because of the Buena Vista dispute, the continuing merchandising campaign, the competition from mass merchants, declining DVD rental margins, and the problems with Blockbuster's technology, Defendants made numerous financial projections without a reasonable basis.

Defendants contend that Plaintiffs' allegations of fraud should be dismissed under

Federal Rule of Civil Procedure 12(b)(6) because (1) all of the alleged misrepresentations and omissions are protected by the Private Securities Litigation Reform Act ("PSLRA") safe harbor provision, as forward-looking statements, (2) the allegedly misrepresented and omitted information is immaterial, (3) application of the fraud-on-the-market theory of reliance is precluded for the alleged failure to disclose the Buena Vista dispute, (4) Defendants did not have a duty to disclose the Buena Vista dispute, (5) Plaintiffs have failed to plead a sufficient factual basis for the alleged misrepresentations and omissions, and (6) Plaintiffs have failed to plead scienter adequately.  The Court will analyze each argument in turn.

## II.  PSLRA SAFE HARBOR

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 235 F. Supp. 2d 549, 575 (S.D. Tex. 2002) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999)); *see also* H.R. CONF. REP. NO. 104-369, *reprinted in* 1995 U.S.C.C.A.N. 730, 743 ("The first prong of the safe harbor requires courts to examine only the cautionary statement accompanying the forward-looking statement.  Courts should not examine the state of

4

mind of the person making the statement."). The Court finds that the following statements[1] are

protected under the PSLRA safe harbor for forward-looking statements, and thus dismisses

Plaintiffs' claims with prejudice to the extent they are premised on these statements:

1.  "Going forward, the Company expects rental margins will be enhanced by the continued growth of DVD as a rental format." Am. Compl. ¶ 30.

2.  "Our plan is to triple our retail share by 2006, increasing our revenues from approximately $400 million this year to 9 percent of approximately $20 billion or $1.8 billion." Am. Compl. ¶ 35; 70.

3.  "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, [. . . ] the Company believes that it will achieve double digit EBITDA growth, which will result in significant EPS growth." Am. Compl. ¶ 53.

4.  "For the full year [2002], gross profit is expected to increase in the mid-single digit range, driven by a combination of sales growth and margin improvement due to growth in higher margin DVD rentals. Additionally, for the full year, the percentage increase in worldwide same store revenues is expected to be in the low to mid-single range. For the full year, the Company believes that it will achieve double digit EBITDA growth, which will result in growth of 2002 EPS over 2001 cash EPS of at least 20%." Am. Compl. ¶ 60.

5.  "Given the strengthening in Q2, we expect gross profit to grow in mid-single digit for the quarter and low single digit comp store sales. This growth translates into strong EBITDA growth. We expect the [gross profit] to grow at least in the mid-single range that translates into double digit EBITDA growth. In summary, we are pleased with store operations that set the industry standard in terms (sic) execution and diligence." Am. Compl. ¶ 61.

6.  "Moving forward, we are strategically positioning Blockbuster to become a complete source for movies and games with innovative marketing and merchandising initiatives designed to strengthen our rental proposition while increasing our share of the growing retail market." Am. Compl. ¶ 69.

---

[1] For ease of reference, the Court has assigned numbers to the statements excerpted from the Amended Complaint. These numbers do not correspond to the numbered paragraphs in the Amended Complaint.

7.   "During the second quarter of 2002, we increased our focus on the sale of new movies and games to complement our rental offerings and to accommodate increased demand.  As a result of this increased focus, we expanded the selection in our stores for DVD and games hardware and software.  We expect the strong growth in merchandise sales to continue for the rest of the year and beyond, as we anticipate consumer demand for these products will continue to grow."  Am. Compl. ¶ 75.

8.   "Beginning in August, as a result of the investments we made in product and marketing to initiate new consumer programs, we experienced increased sales momentum in both our rental and retail business.  That momentum continues, and we believe positions the company to exceed previous fourth quarter guidance and achieve full-year expectations and double-digit revenue growth in 2003 and beyond."  Am. Compl. ¶ 78.

9.   "In line with current analyst consensus expectations, the Company believes that it will achieve full-year 2002 EPS growth of approximately 30% over 2001 EPS, excluding charges, of $1.01."  Am. Compl. ¶ 78.

10.  "For the fourth quarter, we expect results to exceed current expectations, meaning you can expect analysts (sic) add the three cent shortfall in the third quarter to the full year results, leaving full-year estimates unchanged."  Am. Compl. ¶ 79.

The definition of "forward-looking statement" includes statements containing a projection of revenues, income, or earnings per share; statements of the plans and objectives of management for future operations; and statements of future economic performance.  15 U.S.C. § 78u-5(i)(1). The ten statements listed above project future growth in rental margins, profits, earnings before interest, taxes, depreciation, and amortization ("EBITDA"), earnings per share ("EPS"), share of the retail market, and consumer demand--thus qualifying as forward-looking statements under the PSLRA.

A statement that qualifies as forward-looking under the PSLRA is protected by the safe harbor if it is identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from

those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). The PSLRA specifically

provides that, in the case of an oral forward-looking statement, the aforementioned requirement

shall be deemed met if the forward-looking statement is accompanied by a cautionary statement

that identifies the statement as forward-looking, states that actual results might differ materially

from those projected, and incorporates by reference meaningful cautionary language in a readily

available written document. 15 U.S.C. § 78u-5(c)(2). The PSLRA is silent about whether

meaningful cautionary language can be incorporated by reference when the forward-looking

statement is written, rather than oral. The PSLRA safe harbor is "based on aspects of . . . the

judicial[ly] created 'bespeaks caution' doctrine." H.R. CONF. REP. NO. 104-369, *reprinted in*

1995 U.S.C.C.A.N. 730, 742. The Fifth Circuit has characterized the bespeaks caution doctrine

as merely reflecting "the unremarkable proposition that statements must be analyzed in context."

*Rubinstein v. Collins*, 20 F.3d 160, 167 (5th Cir. 1994). In light of this characterization, the

Court concludes that, as long as the reference is clear and explicit so that the referenced

cautionary language can fairly be viewed as part of the "context" surrounding the written

forward-looking statement, the PSLRA safe harbor for written forward-looking statements can be

satisfied by meaningful cautionary language that is incorporated by reference. *See Karacand v.*

*Edwards*, 53 F. Supp. 2d 1236, 1245 (D. Utah 1999) (holding that, because the bespeaks caution

doctrine does not require the cautionary language to be in the same document as the alleged

misstatement or omission, the PSLRA similarly does not impose such a requirement). This

conclusion is buttressed by the illogic of allowing incorporation by reference into oral statements,

when the listener may mishear or forget the location of the referenced cautionary language, but

not allowing incorporation by reference into written statements, when the reader is at

significantly less risk of misinterpreting or forgetting.

In order to qualify as meaningful cautionary language, the language must identify important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A)(i). In *Harris v. Ivax Corp.*, the Ninth Circuit rejected the plaintiffs' argument that the cautionary language was "mere boilerplate" because it was "detailed and informative" and told "the reader in detail what kind of misfortunes could befall the company and what the effect could be." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999). Contrary to Plaintiffs' assertion, the cautionary language need not list the specific risk factor alleged to have rendered the forward-looking statement false. *Harris*, 182 F.3d at 807 ("To be 'meaningful,' must the cautionary language explicitly mention *the* factor that ultimately belies a forward-looking statement? We think not.") (citing the House Conference Report accompanying the PSLRA).

In order to analyze whether the forward-looking statements alleged in the Amended Complaint are within the PSLRA safe harbor, "the Court must examine piecemeal the statements made by the company as expressed in the pleadings." *In re Enron*, 235 F. Supp. 2d 549, 576 (S.D. Tex. 2002). Therefore, the Court will separately analyze each statement listed above to determine whether it satisfies the PSLRA safe harbor. Each statement is accompanied by language warning the reader that the news release, call, or report contains forward-looking statements, identifying numerous risk factors that could cause the projections to vary, and referencing additional risk factors contained in Blockbuster's annual report. For example, the following language, which accompanies Statement 1, typifies the type of language accompanying Statements 1-10.

8

This news release contains forward-looking statements relating to Blockbuster's plans to re-merchandise its stores, including, without limitation, statements related to the following: Blockbuster's plans to increase the presence of DVDs and DVD players in its stores and the related elimination of slower-moving VHS units and games; Blockbuster's expectations regarding the anticipated financial impact of its re-merchandising efforts; and Blockbuster's intent to implement marketing initiatives to support its increased focus on the DVD format. These forward-lookng statements are based on Blockbuster's current intent, expectations, estimates, and projections and are not guarantees of future performance. These statements involve risks, uncertainties, assumptions, and other factors that could cause actual results to vary materially from those expressed in or indicated by them. Factors include, among others: Blockbuster's ability to effectively execute its re-merchandising plans; consumer demand for DVDs and the impact of competitive product and service offerings and pricing; the impact of technological shifts on Blockbuster's business; and other factors, as set forth under the heading "Cautionary Statements" in Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000.

Blockbuster's annual report on Form 10-K for the fiscal year ended December 31, 2000 includes seven pages of cautionary statements, which are incorporated by reference into the paragraph quoted above. Therefore, the Court finds that the forward-looking statements are identified as such and are accompanied by meaningful cautionary language, thus satisfying the PSLRA safe harbor.

The following statements are forward-looking, but were not identified as such and were not accompanied by cautionary language. Thus, the safe harbor is not satisfied as to these statements:

11.   In response to a question about the impact of DVD sales on Blockbuster: "We think the retail business will continue to grow and we think the rental business will continue to grow. . . ." Am. Compl. ¶ 54.

12.   "I mean, we've got a great business, a great brand . . . we feel comfortable in our ability to grow our business in a meaningful and sustainable way over a long period of time. And if that translates, and hopefully it should, to a higher stock price, then we don't think the upside is over for Blockbuster." Am. Compl. ¶ 62.

9

13.    "We really did not know how to compete against retail DVD in 2001. I think we have figured that out, and you will see that reflected in our results for the balance of 2002." Am. Compl. ¶ 63.

Defendants argue that, in addition to the thirteen statements identified above as forward-looking, the Court should treat this entire case as a "forward-looking statements case." Plaintiffs' suit is premised on the drop in stock price that followed Blockbuster's amended financial projections. Therefore, relying on *Harris v. Ivax Corp.* and *Lemmer v. Nu-Kote Holding, Inc.*, Defendants argue that, even if Plaintiffs could show that Defendants made fraudulent misrepresentations and omissions about, for example, the destruction of VHS inventory, those misrepresentations and omissions would be shielded because Plaintiffs complain solely about their effect on Blockbuster's financial projections, which are themselves protected forward-looking statements. In *Harris*, the Ninth Circuit held that a plaintiff could not premise a lawsuit on the absence of a material factor in the cautionary language accompanying a forward-looking statement because "the entire list of factors is treated as a forward-looking statement." *Harris*, 182 F.3d at 807. Similarly, in *Lemmer*, the court found that a plaintiff could not assert a claim for fraudulent omissions of material fact where the plaintiff contended that the duty to disclose the material fact arose from the forward-looking statements: "That is, she bases her claims on omissions of material fact which Nu-Kote was required to communicate *because* they conflicted with Nu-Kote's vague statements about current operations and predictions about future results. Accordingly, the omissions of material fact on which the Complaint is based are subject to the 'safe harbor' for forward-looking statements." *Lemmer v. Nu-Kote Holding, Inc.*, No. 3:98-CV-0161-L, 2001 WL 1112577, at *5 (N.D. Tex. Sept. 6, 2001) (Lindsay, J.).

The Court agrees with *Harris* that Plaintiffs' claims cannot be premised on the failure to

10

include a risk factor in the cautionary language accompanying a forward-looking statement. Similarly, the Court agrees with *Lemmer* that Plaintiffs cannot assert a claim based on the failure to disclose information if the duty to disclose is premised on the forward-looking statement. However, the Court does not read these cases to suggest that, simply because a representation or omission would affect a forward-looking statement, the representation or omission is non-actionable. If the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists. For example, assume a hypothetical case in which Company X made glowing financial projections and simultaneously fraudulently represented that Company X had entered into a profitable contract. Later, because it had not entered into the profitable contract, Company X was forced to significantly alter its financial projections and Company X's stock price dropped precipitously as a result. If Defendants' argument were accepted, the fraudulent misrepresentation about the profitable contract would not be actionable merely because it affected a financial projection. Therefore, simply by making financial projections, a company would insulate itself from liability for virtually all fraudulent statements and omissions because, in the securities context, material statements and omissions are invariably related, at least tangentially, to a company's current and future financial position. The Court rejects Defendants' argument that this is entirely a "forward-looking statements case." To the extent that Plaintiffs allege that Defendants made material misrepresentations and omissions that are independently actionable without reference to the protected forward-looking statements, the PSLRA safe harbor does not apply.

11

## III. MATERIALITY

A misrepresentation or omission of information is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the company. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 361 (5th Cir. 2002). "[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). "Vague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d at 888. The Court finds Statements 11-13, *supra*, and Statements 14-15, excerpted below, to be mere vague expressions of corporate optimism, and thus dismisses with prejudice Plaintiffs' claims to the extent they are premised on these statements.

> 14.  "[W]e undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. ¶ 53.

> 15.  "Our first quarter performance speaks to the strengths of our business and validates the strategy that we implemented last year focusing on high-growth game and DVD formats." Am. Compl. ¶ 60.

In addition to arguing that many of the statements identified by Plaintiffs are immaterial puffery, Defendants argue that none of the alleged misrepresentations and omissions are material

because Plaintiffs have not alleged that they affected Blockbuster's stock price. However, Plaintiffs have alleged that (1) the stock price dropped when Blockbuster announced that it would fall short of its prior projections and (2) the reason that Blockbuster was unable to meet its prior projections was because of existing problems that were misrepresented or omitted prior to the announcement. Therefore, Plaintiffs have alleged that the stock price dropped as a result of disclosure of the effect of underlying facts that were misrepresented and omitted.

Defendants, relying on *ABC Arbitrage*, contend that this indirect allegation of an effect on stock price is insufficient. In *ABC Arbitrage*, the Fifth Circuit found that the plaintiffs did not plead sufficiently that the alleged misrepresentations and omissions were material because the plaintiffs did not plead that the predictions did not account for known problems and losses. *ABC Arbitrage*, 291 F.3d at 361. Without that, the Court found that no reasonable investor would view the information as significantly altering the total mix of information about investing in the company. *Id.* Then, the Court found that the mere drop in stock price following an announced anticipated failure to meet previous expectations, where misrepresented and omitted problems allegedly contributed to the failure to meet expectations, was not sufficient to "save" Plaintiffs' claims. *Id.* at 362.

In contrast to the facts in *ABC Arbitrage*, here a reasonable jury could find that a reasonable investor would have viewed the dispute with Buena Vista, the alleged scheme to destroy Blockbuster's VHS inventory, the alleged negative effect of competition from mass merchants, and the alleged misrepresentations about DVD rental margins to have significantly altered the total mix of information about investing in Blockbuster. The Court is not looking to the drop in stock price to establish materiality and "save" Plaintiffs' claims, but rather is

13

analyzing the potential materiality of the allegedly omitted and false information and the impact such had on the restatement. Therefore, the Court rejects Defendants' argument that *ABC Arbitrage* compels the Court to hold that, even if a reasonable jury could find the information allegedly misrepresented or omitted to be material, it is immaterial simply because Plaintiffs have failed to allege that the stock price dropped upon public disclosure of the information.

That this interpretation of *ABC Arbitrage* is logical is demonstrated by the following hypothetical: Company X makes glowing financial projections for the year and knowingly misrepresents that Company X has entered into a profitable contract. Because the glowing projections are based on the false representations regarding the profitable contract, halfway through the year, Company X is forced to amend its projections, projecting a poor second half of the year. The stock price of Company X plummets. The reason that Company X restates its projections is because the revenue from the unsecured contract is not forthcoming, but Company X does not disclose that this is the reason for the restatement, and manages to keep the true reason secret. If Defendants' argument were accepted, Company X's misrepresentation about the profitable contract would be immaterial and thus non-actionable. The Court does not interpret *ABC Arbitrage* to compel this result. Therefore, the Court rejects Defendants' argument that all of Plaintiffs' claims should be dismissed for failure to allege materiality.

## IV. RELIANCE

Defendants, relying on *Nathenson v. Zonagen*, 267 F.3d 400 (5th Cir. 2001), contend that the failure to disclose the Buena Vista dispute is not actionable because Plaintiffs rely on the "fraud on the market" theory of reliance and the eventual disclosure of the Buena Vista lawsuit did not negatively affect the stock price. In *Nathenson*, the plaintiffs alleged that the defendants

14

misrepresented that certain medical research trials had produced statistically significant results. *Id.* at 417. The plaintiffs relied on the fraud-on-the-market theory, which is based on the rebuttable presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market. Throughout the several months following the defendants' disclosure that the research trials had not produced statistically significant results, the stock price rose. *Id.* at 418. The Fifth Circuit held: "If the market price was not *actually* affected by the statement, reliance on the market price does not *of itself* become reliance on the statement." *Id.* at 419. Therefore, the Court held that the plaintiffs were unable to use the fraud-on-the-market theory to establish reliance and affirmed the district court's dismissal of the complaint with respect to the alleged misrepresentations. *Id.*

In *Nathenson*, the plaintiffs' suit was premised on affirmative misrepresentations; in the present case, Plaintiffs' suit is premised on a failure to disclose the Buena Vista dispute. "[W]here the gravamen of the fraud is a failure to disclose, as opposed to a fraudulent misrepresentation, a plaintiff is entitled to a rebuttable presumption of reliance." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (Lynn, J.) (relying on *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972), and *Smith v. Ayres*, 845 F.2d 1360, 1363 (5th Cir. 1988)). Therefore, in the current case, in contrast to *Nathenson*, if here pled, Plaintiffs would be entitled to a rebuttable presumption of reliance rendering the fraud-on-the-market theory of reliance extraneous.

Even if Plaintiffs were to rely on the fraud-on-the-market theory of reliance rather than the rebuttable presumption of reliance, the Court finds that *Nathenson* would be distinguishable if Plaintiffs had sufficiently pled that (1) the stock price dropped on December 18, 2002 as a

result of the amended earnings estimates, (2) the earnings estimates had to be revised to take into account the contingent liability related to the Buena Vista dispute, and (3) the market did not react to the public disclosure of the Buena Vista dispute on January 2, 2003, because the market had already absorbed the effects of the negative information when it reacted to the restated earnings estimates, which were predicated in part on the Buena Vista dispute.

However, Plaintiffs' Amended Complaint pleads neither a presumption of reliance nor a reason why the stock price was unaffected by the public disclosure of the Buena Vista dispute. Therefore, the Court agrees with Defendants that Plaintiffs' pleading of reliance with respect to the failure to disclose the Buena Vista dispute is insufficient. The Court therefore dismisses Plaintiffs' Amended Complaint, without prejudice, to the extent it is premised on the failure to disclose the Buena Vista dispute. In other portions of this Opinion, the Court will identify additional deficiencies in the Amended Complaint with respect to this claim.

## V.  DUTY TO DISCLOSE

According to Plaintiffs, Buena Vista notified Blockbuster no later than June 20, 2001 that Buena Vista viewed Blockbuster as breaching their contract and causing Buena Vista damages of almost one hundred million dollars. Buena Vista did not file suit against Blockbuster until December 31, 2002, which was after the Class Period. However, Plaintiffs allege that Blockbuster should have disclosed its dispute with Buena Vista during the Class Period. Between June 20, 2001, when Blockbuster allegedly learned of the potential for liability to Buena Vista, and December 17, 2002, the end of the Class Period, Blockbuster filed one Form 10-K report and several Form 10-Q reports. Plaintiffs allege that Blockbuster should have disclosed in these reports its potential liability to Buena Vista and that the financial statements included in

these reports violated GAAP because they failed to account for this contingent liability.

Absent a duty to disclose, the failure to disclose information, even if that information is material, is not actionable. *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). Plaintiffs allege that GAAP and Item 303 of Regulation S-K required disclosure of the Buena Vista dispute. Statement of Financial Accounting Standards No. 5 ("SFAS No. 5") requires a charge to income if both of the following conditions are met:

> a. Information prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of the loss can be reasonably estimated.

Additionally, if no accrual is made for a loss contingency because one or both of the above conditions are not met, SFAS No. 5 provides:

> [D]isclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

Finally, Item 303 of Regulation S-K requires the disclosure of known trends, demands, commitments, events, and uncertainties that are reasonably likely to have a materially adverse effect on a company's liquidity, net sales, capital resources, revenues, or income from continuing operations. 17 C.F.R. § 229.303.

17

Plaintiffs' Amended Complaint fails to allege that, during the Class Period, it was probable or reasonably possible that the Buena Vista dispute would result in a loss, that the amount of the loss could be reasonably estimated, or that the dispute was reasonably likely to have a materially adverse effect on Blockbuster's liquidity, net sales, capital resources, revenues, or income from continuing operations.  Therefore, Plaintiffs have failed to allege that Blockbuster had a duty to disclose the Buena Vista dispute during the Class Period.  Although the Court is dismissing without prejudice Plaintiffs' claims to the extent they are premised on the failure to disclose the Buena Vista dispute, this is an additional defect with respect to those claims of which Plaintiffs must take account when repleading, to determine if the claim can legitimately be asserted.

## VI.  PSLRA PLEADING REQUIREMENTS

In order to state a claim under section 10(b) of the 1934 Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused the plaintiff's injury.  *ABC Arbitrage*, 291 F.3d at 348.  The PSLRA and Federal Rule of Civil Procedure 9(b) require a plaintiff to plead fraud with particularity.  The Fifth Circuit describes this requirement as follows:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
> (1) specify . . . each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
> (2) identify the speaker;
> (3) state when and where the statement was made;
> (4) plead with particularity the contents of the false representations;
> (5) plead with particularity what the person making the misrepresentation

18

> obtained thereby; and
>
> > (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.
>
> This is the "who, what, when, where, and how" required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA. Additionally, under 15 U.S.C. § 78u-4(b)(1), for allegations made on information and belief, the plaintiff must:
>
> > (7) state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.
>
> *ABC Arbitrage*, 291 F.3d at 350.

An allegation is "made on information and belief" when it is not based on a plaintiff's personal knowledge. *Id.* at 351. Since Plaintiffs' allegations are made "based upon the investigation of their counsel" rather than on Plaintiffs' personal knowledge, Plaintiffs must set forth a factual basis for their allegations. Defendants contend that Plaintiffs' Amended Complaint fails to satisfy the pleading requirements of the PSLRA. The Court will analyze each category of alleged fraud in turn to determine whether the PSLRA pleading requirements are satisfied.

**A. Alleged fraudulent scheme relating to the destruction of VHS inventory**

In Blockbuster's 2001 Form 10-K, Blockbuster announced that it had completed the implementation of the merchandising campaign as of December 31, 2001. Plaintiffs contend that, under the internal name of MOP, the merchandising campaign continued into 2002. Plaintiffs additionally contend that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs, *i.e.*, "shrink," or theft, was false.

Plaintiffs have pled a sufficient factual basis for Plaintiffs' allegation that MOP

19

continued in 2002. According to a former manager from California, MOP "began late in 2001 and was ongoing throughout 2002." Am. Compl. ¶ 32(1). According to a former Texas store manager, MOP started at the end of 2001 and continued into 2003. Am. Compl. ¶ 32(4). Another Texas store manager stated that MOP continued into the spring of 2002. Am. Compl. ¶ 101. A former Maryland store manager stated that he received e-mails throughout 2002, instructing him to destroy VHS tapes under MOP. Am. Compl. ¶ 32(5).

However, Plaintiffs have failed to plead a sufficient factual basis for the contention that MOP was the same merchandising campaign that the 2001 Form 10-K stated was completed as of December 31, 2001. The Amended Complaint states: "A former district manager in California stated that the program became known as 'the MOP [Merchandise Opportunity Program], began in late in 2001 and was ongoing throughout 2002.'" Am. Compl. ¶ 32(1). This oblique link between the campaign described in the 2001 Form 10-K and MOP is insufficient under the PSLRA.

Plaintiffs have additionally failed to plead a sufficient factual basis for their allegations that the financial statements for the first half of 2002 were inaccurate because they did not take into account the costs of the continuing merchandising campaign, that the improperly deferred costs of the merchandising campaign were reflected in the financial statements for the second half of 2002 as merchandise sales costs, and that Blockbuster's proffered reason for the increase in merchandise sales costs was false.

Plaintiffs quote a former district manager from California as stating: "[Blockbuster] was doing a program where they basically cut half of the product in every store and (sic) selling it for no price at all. In order to do that, they hid product in a different line in the P&L." Am. Compl.

¶ 32(1). Plaintiffs also quote a former store manager who managed eight stores during his tenure with Blockbuster as stating that it "doesn't make sense" that shrinkage would have increased in the fourth quarter of 2002. Am. Compl. ¶ 111. Another store manager stated that "shrinkage happened continually and that it was unlikely that Blockbuster would record a loss on shrinkage in any one quarter." Am. Compl. ¶ 111. A former Blockbuster district manager, whose district had the highest rate in the United States of shrinkage, stated that it did not make sense for shrinkage to spike in the fourth quarter of 2002 and that historically the fourth quarter was not the quarter reflecting the highest reported shrinkage. Am. Compl. ¶ 111.

Plaintiffs' pleading is insufficient because there are no facts alleged from which one could conclude that the employees quoted were privy to how or when the costs of MOP were accounted for on Blockbuster's financial statements or to the level of company-wide shrinkage in 2002. In a case where the confidential sources are not named and the other facts do not provide an adequate basis for believing that the alleged statements were false, the personal sources must be identified "with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded." *ABC Arbitrage*, 291 F.3d at 353. Here, without further description of a district manager's job, it is not probable that a district manager would be privy to how the costs of MOP were reflected in Blockbuster's financial statements. It is similarly not probable that two store managers and one district manager would know the rates of company-wide shrink in the fourth quarter of 2002. Therefore, the Court dismisses without prejudice[2] Plaintiffs' claims premised on an alleged fraudulent

_____

[2] To the extent the Court dismisses Plaintiffs' claims for pleading defects, the dismissal is without prejudice. However, in so doing, the Court does not intend to suggest that Plaintiffs should re-urge the claims upon repleading. Plaintiffs shall determine whether it is possible to

21

scheme relating to the destruction of VHS inventory.

**B. Alleged fraud relating to the competition posed by mass merchants of DVDs**

Plaintiffs have failed to plead adequately that Defendants failed to disclose the competition posed by mass merchants of DVDs. Rather than hiding the competition posed by mass merchants, the statements quoted by Plaintiffs in the First Amended Complaint explicitly recognize that competition. Additionally, Plaintiffs have failed to adequately plead why Defendants' statements related to this competition were misleading or fraudulent. The statements recognize the competition and highlight Blockbuster's plan for combating that competion. Blockbuster "was under no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig*, 332 F.3d at 869. Therefore, Plaintiffs' claims of misrepresentations and omissions related to the following statements are dismissed without prejudice:

16. "We think that the retail business will continue to grow and we think the rental business will continue to grow. . . . I think one would be mistaken to think that they're mutually exclusive. But when it gets right down to it, when you look at number of transactions, retail transactions are, you know, only a fraction of what rental transactions are, and that's because the vast majority of movies that are produced by Hollywood, most people only want to watch them once. . . . Do I really need to own this movie for, you know, what today is a $20 price point. I don't think that dynamic changes very much, even if the price point went to $12." Am. Compl. ¶ 54.

17. "It's important to note that there is no downside implications to Blockbuster increasing its share of the retail market. In the--in addition to the opportunity for incremental sales, we make the same gross margin dollars on a DVD sale as we do on a rental. So we are ambivalent as to how customers use us. Retail, rental, new, used, DVD, VHS." Am. Compl. ¶ 70 (sic).

---

cure the identified pleading defects and shall only reassert those claims, if any, that can be pled in compliance with the PSLRA.



18.  In response to a question about how Blockbuster plans to compete with their competitors who are selling DVDs making "a buck or nothing": "So our view is the best way to combat that, quite frankly, is to use a rental promotional currency. So at Blockbuster the price of that DVD might be $17.99 or $18.99 or $19.99. Couple that with a free rental offer. We think that converts to a great value for the consumer without necessarily lowering the profit dollars on the transaction. So we feel comfortable through managing the mix, through item price management, through using promotional currency, that we can manage the margin dollars effectively and still give the consumer a great value." Am. Compl. ¶ 71.

## C. Alleged fraud relating to DVD rental margins

Plaintiffs allege that Defendants misrepresented that the gross profit margin on DVD rentals was 70% when it was actually lower, and that Defendants misrepresented that the gross profit margin on DVD rentals was 10 percentage points higher than the gross profit margin on VHS rentals, when the gross profit margin on DVD rentals was actually only 3 or 4 percentage points higher. Plaintiffs identify the following statements as alleged misrepresentations:

19.  In 2001, "[W]e undertook a number of key initiatives to strengthen our core business and drive growth in profitability, including re-merchandising our stores to expand our selection of higher margin DVDs and dedicating more of our sales area to high-growth new game formats and promising new business opportunities." Am. Compl. ¶ 53.

20.  "Blockbuster now has three DVD revenue sharing agreements, which help the company to lower inventory costs, increase product depth and share risk. These agreements do not include an exclusive window, but do preserve the approximate 70% margin on DVD rentals." Am. Compl. ¶ 55.

21.  "In addition, our merchandise gross margin declined due to an increase in DVD sales as a percentage of total merchandise sales, primarily due to the current competitive environment for retail DVD. These decreases were partially offset by an increase in our rental gross margin, primarily due to an increase in the percentage of rental revenues attributable to DVD rental product, which on average has a lower overall cost than other rental product." Am. Compl. ¶ 75.

22.  "We are maintaining our margins on DVD rentals in the high 60s, and we are increasing our copy depth, and we are not giving up our flexibility to market and sell previously viewed DVDs, which we also feel is very important to our

business." Am. Compl. ¶ 80.

Statement 20 is from a February 12, 2002 report issued by Salomon Smith Barney. Plaintiffs have failed to plead sufficient facts to impute to Defendants the "70% gross profit margin" statement in the analyst's report. "[T]o hold a defendant liable for misleading statements published by a third party, the plaintiff must at least identify the defendant who provided the information that the third party made public to the market." *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 562 (N.D. Tex. 2003) (Lindsay, J.). Additionally, the plaintiff must plead facts "demonstrating that Defendants exercised control over any of the analysts' comments." *In re Sec. Litig. BMC*, 183 F. Supp. 2d at 893. Here, since the speaker is not identified and no facts are pled to show Defendants' control over the analyst's comments, the Court dismisses without prejudice Plaintiffs' claims based on Statement 20.

Additionally, even if Statement 20 could be attributed to Defendants, Plaintiffs have failed to adequately plead that this statement was false or misleading when made. Plaintiffs allege that this statement was false when made because, in a February 12, 2003 press release, Blockbuster stated: "Rental margin declined to 66.6% in the fourth quarter of 2002 from 67.3% in the fourth quarter of 2001 as a result of the investment in incremental rental product in support of the expected higher rental revenues, which did not materialize." Am. Compl. ¶ 87. However, this press release discusses the combined rental margin for DVD and VHS, not the rental margin for DVD alone, while the alleged 70% statement refers to DVD rental margin alone. Therefore, this press release does not support an inference that Statement 20 was false when made.

Plaintiffs additionally allege that Defendants misrepresented that there was a 10 percentage point differential between DVD and VHS rental margins, when it was later disclosed

to be only a 3 to 4 percentage point differential. Am. Compl. ¶ 36, 89. However, Plaintiffs do not allege any specific facts about who made this statement, when it was made, or to whom it was made. Since Plaintiffs have completely failed to plead the "who, what, when, where, how" details about this alleged statement, the Court dismisses without prejudice Plaintiffs' claims based on this alleged misrepresentation.[3]

Finally, Plaintiffs have failed to plead any facts to support the allegation that Statements 19, 21, or 22 were false or misleading when made. In fact, Plaintiffs' Amended Complaint supports the characterization of DVDs as "higher margin," the statement that DVD rental product "on average has a lower overall cost than other rental product," and the statement that the margins on DVD rentals were "in the high 60s." Therefore, the Court dismisses without prejudice Plaintiffs' Amended Complaint to the extent it is premised on alleged misrepresentations contained in Statements 19, 21, or 22.

---

[3] In their Response, Plaintiffs attempt to cure this defect by citing the following excerpt from a February 12, 2002 article in the *Hollywood Reporter*:

> According to Zine, Blockbuster has margins of 70%-plus on DVDs by buying a DVD for $17 on average, renting it and then selling it for $12 on average. VHS sell-through margins are at 70% and VHS revenue sharing margins at 60%.

Even if Plaintiffs had included this statement in their Amended Complaint, Plaintiffs would have failed to sufficiently allege that this statement was false when made. Plaintiffs contend that the *Hollywood Reporter* statement was shown to be false by the February 12, 2003 conference call discussion of the 3 to 4 percentage point differential between DVD and VHS rental margins. The *Hollywood Reporter* statement reports a 10 percentage point differential between the gross profit margins for DVD and VHS rental products that are acquired through sell-through pricing arrangements and the gross profit margins for VHS rental products that are acquired through revenue sharing arrangements. Therefore, the February 12, 2003 conference call statement discussing the differential between DVD rental margins and VHS rental margins, regardless of how the products were acquired, does not support an inference that the *Hollywood Reporter* statement was false when made.



**D. Alleged fraud relating to problems with Blockbuster's technology**

Plaintiffs claim that Blockbuster misrepresented the capability of its inventory management and product distribution systems because its national point-of-sale (POS) system and distribution system were inadequate to support Blockbuster's business, and were in fact generating increased costs. Plaintiffs identify the following alleged misrepresentations:

23. The POS system allows Blockbuster "to determine on a store-by-store basis the number of copies of each newly released movie that is to be offered by each U.S. store." Am. Compl. ¶ 46.

24. The centralized distribution system allows Blockbuster "to process and distribute a greater quantity of products while reducing costs and improving services to our stores." Am. Compl. ¶ 46.

25. In response to a question about how Blockbuster will manage the purchase of a couple hundred video game titles to be released in the second half of 2002: "As far as number of titles to manage, we're not especially troubled by that. Let's face it, we manage thousands of titles every year. So, it's really nothing new about that." Am. Compl. ¶ 71.

In an attempt to plead with particularity facts showing that the above statements were false or misleading when made, Plaintiffs quote one former district manager from California as stating: "[I]t was very frustrating as store manager to be out of DVD movies within two hours of a release and then spend the rest of the week giving out hundreds upon hundreds of coupons because of [Blockbuster's] in stock guarantee." Am. Compl. ¶ 48. This statement, of only one store manager, does not tie the out-of-stock problem to the POS or product distribution systems.

Second, Plaintiffs refer to a former district manager's statements about repricing and inventory during the "remerchandising" program: "The manager explained that to transfer a tape from a rental to a PVT takes some time since new bar codes (sic) labels have to be printed for and placed on each tape. Under MOP, [Blockbuster] used a different method because it would

take 'forever' to manually generate new bar codes and update the selling price for hundreds of movies at a time. . . . When the tapes were transferred back into the stores, they were reflected in [Blockbuster's] system with the designation of 'MOP,' rather than being reflected in the computer with the original title of the movie." Am. Compl. ¶ 48.  These statements about how repricing and inventory were managed during the remerchandising program do not tend to show that Blockbuster's POS and product delivery systems were inadequate to support Blockbuster's business.

Third, Plaintiffs cite Blockbuster's 2002 Form 10-K, filed on March 27, 2003, which includes the following cautionary statements: "Any Failure or Inadequacy of Our Information Technology Infrastructure Could Harm Our Business. . . . [F]or approximately fifteen years, we have been adding applications to our existing point-of-sale, or POS, system in order to add features and functionality relevant to our business, and we have not yet determined how we will approach updates or upgrades to this system in the future.  We may not be able to effectively upgrade and expand our systems, or add new systems, in a timely manner or to integrate smoothly any newly developed or purchased technologies with our existing systems.  These difficulties could harm or limit our ability to improve our business." Am. Compl. ¶ 90.  This statement does not support Plaintiffs' allegation that, during 2002, the POS and inventory management systems were inadequate or caused Blockbuster any problems.

Because Plaintiffs have failed to adequately plead that the statements about POS and the inventory management system were false, the Court dismisses without prejudice Plaintiffs' claims based on Statements 23-25.

27

## VII. INFERENCE OF SCIENTER

The PSLRA also requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If this requirement is not met here, the Court must dismiss the Amended Complaint. 15 U.S.C. § 78u-4((b)(3)(A).

Misrepresentations and omissions are actionable if the plaintiff proves that the defendant acted with "severe recklessness." *Nathenson*, 267 F.3d at 408 ("It seems clear to us that the PSLRA has not generally altered the substantive scienter requirement for claims brought under section 10(b) and Rule 10b-5, and therefore severe recklessness, as defined in *Broad*, remains a basis for such liability."). Under *Broad v. Rockwell*, severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell*, 642 F.2d 929, 961 (5th Cir. 1981). Defendants contend that Plaintiffs have failed to state with particularity facts giving rise to a strong inference that Defendants acted with "severe recklessness" of the falsity of the alleged misrepresentations and omissions.

Although allegations of motive and opportunity may meaningfully enhance the strength of an inference of scienter, allegations of motive and opportunity, without more, will not fulfill the pleading requirements of the PSLRA. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003). The Fifth Circuit has distinguished those complaints alleging opportunity and unrealized motive from those alleging actual insider trading. *See Rosenzweig*, 332 F.3d at 867

28

("We note additionally that there is no allegation that defendants sold their Azurix shares, calling into question the alleged motive to artificially inflate the stock price."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) ("Absent an allegation that the defendants profited from the inflated stock value of the offerings, such allegations fail."). Therefore, although "allegations of insider trading are essentially a form of motive and opportunity allegations," they may be sufficient to support an inference of scienter when they are in suspicious amounts, at suspicious times, and out of line with prior trading practices. *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, No. 02-10558, 2004 WL 626721, at *8 (5th Cir. Mar. 31, 2004) (citing *Abrams*, 292 F.3d at 435). Here, Plaintiffs have alleged motive, opportunity, and insider trading.

### 1. Motive

Plaintiffs allege that the Individual Defendants were motivated to keep the stock price high so that they could sell their holdings at a profit. *E.g.*, Am Compl. ¶ 102 ("[D]efendants were motivated not to disclose that Blockbuster's strategic re-merchandising program was ongoing during 2002 so that they could forestall the Company's reporting of the adverse financial consequences associated with such program until after they sold millions of dollars of Blockbuster stock at artificially inflated prices.").

### 2. Opportunity

Plaintiffs allege that Defendants, as a result of their positions within the Company, must have known about the Buena Vista dispute, the ongoing merchandising program, the competition posed by mass merchants, the gross profit margins on DVD rentals, and the technology problems. Am. Compl. ¶16. Throughout the Class Period, John Antioco was Blockbuster's CEO and Chairman of the Board, Nigel Travis was Blockbuster's President, and Larry Zine was

29

Blockbuster's Chief Financial Officer.

### 3. Insider trading

Prior to the Class Period, none of the Individual Defendants sold any shares of common stock. Am. Compl. ¶ 50. During the Class Period, Antioco, Zine, and Travis sold, respectively, 36%, 27%, and 31%[4] of their holdings. This percentage calculation takes into account vested stock options that were not exercised. During the Class Period, Antioco, Zine, and Travis sold, respectively, 69%, 100%, and 100% of their holdings of stock, excluding options. During the Class Period, Antioco realized a profit of $6,725,739; Zine realized a profit of $955,525; and Travis realized a profit of $1,476,799.

Defendants argue that any suspicious motive suggested by these figures is negated because the Individual Defendants retained a large percentage of their stock options, and it was contrary to their self-interests to inflate the price in the short term at the expense of the long term price. The Court agrees that, if the Individual Defendants had actually lost more money than they gained as a result of the alleged fraud, the aggregate loss might defeat an inference of scienter. In the current case, however, what the Individual Defendants retained were primarily options, not stock. Therefore, although the lower stock price after December 2002 decreased Defendants' potential profits from an exercise of their options, Defendants did not actually lose money because they did not have to pay for the options. Therefore, the Individual Defendants' retention of their vested stock options does not foreclose an inference of fraud. Plaintiffs have stated with

---

[4] The Court notes that the last two rows of the chart on page 553 of Defendants' Appendix seem to incorrectly tally the running totals of options exercised during the Class Period, as the Court understands the facts. In each row, a total of 96,000 options had been exercised.

particularity facts supporting the allegation that the Individual Defendants engaged in trading in suspicious amounts and out of line with prior trading practices.

### 4. Individualized Pleading

As recently clarified by the Fifth Circuit in *Southland Securities Corp. v. INSpire Insurance Solutions Inc.*, the "group pleading" doctrine conflicts with the scienter requirement of the PSLRA. *Southland*, 2004 WL 626721, at * 6. Therefore, generalized pleading about motive, opportunity, and insider sales during the Class Period (even if in suspicious amounts and out of line with prior trading practices) are insufficient to adequately plead scienter. Rather, Plaintiffs must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Id.* (quoting Judge Means's district court opinion). In order to enlighten each Individual Defendant as to his particular part in the alleged fraud, Plaintiffs must provide "specific factual allegations link[ing] the individual to the statement at issue." *Id.* "Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement." *Id.* Further, although statements issued on behalf of a corporation may be attributed to the corporation without specific factual allegations linking an individual to the statement, a "defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *Id.* at *7. Therefore, in analyzing whether Plaintiffs' allegations raise an inference of scienter with respect to the Individual Defendants and Blockbuster, the Court must analyze whether Plaintiffs have alleged a link between each Individual Defendant's alleged insider trading and his particular part in the

31

alleged fraud.[5] In performing this analysis, guided by the Fifth Circuit's analysis in *Southland*, the Court will examine (1) the temporal proximity of the alleged misrepresentation or omission and the stock sale,[6] and (2) the price of the stock when it was sold by the insider. *See also Abrams*, 292 F.3d at 435 (finding that Plaintiffs' allegations of insider trading did not create an

---

[5] In order to plead an inference of scienter with respect to Blockbuster, Plaintiffs could attempt to impute to Blockbuster the scienter of officers, directors, or employees of Blockbuster who are not named as Individual Defendants in this action. *See Southland*, 2004 WL 626721, at *7 (noting that the plaintiffs had not alleged that "any individual INSpire director, officer, or employee *other than* the named individual defendants had acted with scienter in or respecting the making or issuing of any of the complained of statements" and concluding that, as a result, it was only necessary "to address the allegations claimed to adequately show such state of mind on the part of the individual defendants"). Here, Plaintiffs have alleged insider trading by numerous individuals who are not named as parties. However, Plaintiffs have failed to plead with sufficient particularity a connection between those individuals and any of the alleged misrepresentations or omissions. Therefore, the Court need only analyze whether Plaintiffs have pled an inference of scienter with respect to the statements or omissions of the Individual Defendants. Upon re-pleading, if Plaintiffs intend to impute to Blockbuster the scienter of individuals who are not named as parties, Plaintiffs shall identify the specific statements or omissions with which each individual is connected and demonstrate how the individual's stock sales create an inference of scienter with respect to those specific statements or omissions.

[6] Defendants argue that, when examining the temporal proximity of an alleged misrepresentation or omission and a stock sale, the Court should consider an alternative explanation for the timing of the sale of stock: "As with other companies, Blockbuster maintains a trading window prohibiting insider transactions prior to earnings announcements." As recognized by the Fifth Circuit in *Rubinstein*, when deciding a motion to dismiss, the Court should not consider evidence of alternative explanations for the timing of sales. *Rubinstein*, 20 F.3d at 170 n.38 ("The defendants claim in their brief and at oral argument that these sales were innocuous because they were made in response to tax considerations. While this may well turn out to be true, at this stage of the litigation we only have the Plaintiffs (sic) complaint before us. Thus, it is impossible for us to consider this 'evidence' to ascertain whether this purported insider trading occurred at suspicious times or in suspicious amounts."). Therefore, the Court will not consider the Individual Defendants' alternative explanation for the timing of sales. Further, even if the Court were to take this alternative explanation into account, the Court notes that Antioco's sale of 100,000 shares in the week preceding the filing of Blockbuster's May 14, 2002 Form 10-Q and Zine's sale of 25,000 shares the day before the filing of Blockbuster's May 14, 2002 Form 10-Q tend to raise doubts about the proffered alterative explanation.

inference of scienter because sales were not alleged to be "at times calculated to maximize personal profit"); *Nathenson*, 267 F.3d at 420 (finding that Plaintiffs' allegations of insider trading did not raise an inference of scienter because sales were "unrelated to any Company announcements").

**a. John Antioco**

Between April 26, 2002 and April 30, 2002, Antioco sold 141,840 shares, at share prices of $28.6973 and $28.5151. On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002. Plaintiffs have not pled specific factual allegations linking that press release to Antioco, and therefore, Antioco's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Antioco participated in a conference call with analysts; on April 25, 2002, Antioco gave an interview to *Bloomberg Business News*; and, on April 28, 2002, *Video Store* published an article quoting Antioco. Therefore, Plaintiffs have pled temporal proximity between Antioco's stock sales and the statements or omissions contained in the aforementioned conference call, interview, and article. Further, in light of Plaintiffs' allegation that Antioco's fraudulent statements or omissions contained in the aforementioned conference call, interview, and article inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when Antioco sold it, roughly $28.00 per share, and the $13.13 price at the close of the market on December 18, 2002. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when Antioco sold it, the Court finds that Plaintiffs' allegations create an inference that Antioco, and thus Blockbuster, acted with the requisite scienter when

33

making the alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article.

Between May 10, 2002 and May 17, 2002, Antioco sold 275,000 shares, at share prices between $28.55 and $29.648.  On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002.  Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Antioco's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. Antioco did not benefit from the alleged misrepresentations and omissions by selling his stock prior to their alleged effect on the stock price.  Further, Plaintiffs have not pled specific factual allegations linking the form 10-Q to Antioco,[7] and therefore, Antioco's sale of stock shortly after its filing does not raise an inference of scienter with respect to the Form 10-Q.

In summary, Plaintiffs' allegations create an inference of scienter with respect to Antioco's alleged misrepresentations and omissions in the April 24, 2002 conference call, April 25, 2002 interview, and April 28, 2002 article, and that inference of scienter is imputed to Blockbuster.  However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Antioco acted with the requisite scienter.

**b. Larry Zine**

On April 26, 2002, Zine sold 33,333 shares, at a share price of $28.6973.  On April 24, 2002, Blockbuster issued a press release announcing its financial results for the first quarter of 2002.  Plaintiffs have not pled specific factual allegations linking that press release to Zine, and

---

[7] The Court does not reach the issue of whether, if Plaintiffs had alleged a link between the Form 10-Q and Antioco as a result of Antioco's position as CEO and Chairman of the Board, such an allegation would be sufficient.

therefore, Zine's sale of stock shortly after its issuance does not raise an inference of scienter with respect to that press release. On April 24, 2002, Zine participated in a conference call with analysts. Therefore, Plaintiffs have pled temporal proximity between Zine's stock sales and Zine's statements or omissions contained in the aforementioned conference call. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the aforementioned conference call inflated the stock price until December 18, 2002, the Court notes the dramatic difference between the price of the stock when sold, approximately $28.00 per share, and the price at the close of the market on December 18, 2002, $13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs have alleged that, like Antioco, Zine (and thus Blockbuster) acted with the requisite scienter when making the alleged misrepresentations and omissions in the April 24, 2002 conference call.

On May 13, 2002, Zine sold 25,000 shares, at a share price of $28.7781. On May 16, 2002 and May 17, 2002, Zine sold a total of 40,000 shares, for share prices of $29.6459 and $29.3576. On May 14, 2002, Blockbuster filed its Form 10-Q for the first quarter of 2002, signed by Zine. Since Plaintiffs allege that the Form 10-Q contained fraudulent misrepresentations and omissions that artificially *inflated* the stock price, Zine's stock sales *prior* to May 14, 2002 do not raise an inference of scienter with respect to the Form 10-Q. However, Zine's sales on May 16, 2002 and May 17, 2002 are temporally proximate to the filing of the Form 10-Q, which was signed by Zine. Further, because Plaintiffs allege that the fraudulent statements or omissions contained in the Form 10-Q inflated the stock price until December 18,

35

2002, the Court notes the substantial difference between the price of the stock when sold, approximately $29.00 per share, and the price at the close of the market on December 18, 2002, $13.13 per share. Therefore, in light of the alleged motive, opportunity, suspicious amount of sales, unusual trading activity, temporal proximity between the alleged fraud and the sales, and the price of the stock when sold, the Court finds that Plaintiffs have alleged that Zine, and thus Blockbuster, acted with the requisite scienter when making the alleged misrepresentations and omissions in the Form 10-Q.

In summary, Plaintiffs have pled an inference of scienter with respect to Zine's alleged misrepresentations and omissions in the April 24, 2002 conference call and the May 14, 2002 Form 10-Q, and that inference of scienter is imputed to Blockbuster. However, with respect to all other misrepresentations or omissions, Plaintiffs' allegations fail to create an inference that Zine acted with the requisite scienter.

## c. Nigel Travis

On February 14, 2002, Travis sold 66,666 shares, at a share price of $21.5066. On February 12, 2002, Blockbuster issued a press release announcing its financial results for the 2001 calendar year, Antioco gave an interview to *Bloomberg Business News*, and Salomon Smith Barney issued a report rating Blockbuster's stock as "neutral." Plaintiffs have not pled specific factual allegations linking the press release, interview, or report to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release, interview, or report. On July 29, 2002, Travis sold 40,000 shares, at a share price of $24.0439. On July 24, 2002, Blockbuster issued a press release announcing its financial results for the second quarter of 2002, and Antioco and Zine participated in a conference call. Plaintiffs

36

have not pled specific factual allegations linking the press release or conference call to Travis, and therefore, Travis's sale of stock shortly thereafter does not raise an inference of scienter with respect to the press release or conference call. Plaintiffs' allegations fail to create an inference that Travis acted with the requisite scienter.

## VIII. SECTION 20(A) CLAIMS

Section 20(a) of the Securities Exchange Act provides in pertinent part: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable. . . ." 15 U.S.C. § 78t. There can be no liability under section 20(a) without a finding that a provision of the Securities Exchange Act has been violated. Therefore, to the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to Statements 1-15, Plaintiffs' section 20(a) claim is dismissed with prejudice. To the extent Plaintiffs' section 20(a) claim is premised on Plaintiffs' claims related to other alleged misrepresentations and omissions, Plaintiffs' section 20(a) claim is dismissed without prejudice.

## IX. LEAVE TO AMEND

The Court dismisses with prejudice Plaintiffs' claims premised on Statements 1-10 because they are protected by the PSLRA safe harbor for forward-looking statements, and Plaintiffs' claims premised on Statements 11-15 because they are immaterial as a matter of law.

The remainder of Plaintiffs' claims are dismissed because they are inadequately pled. In Plaintiffs' Response to Defendants' Motion to Dismiss, Plaintiffs do not seek leave to amend Plaintiffs' Amended Complaint in the event that the Court finds Plaintiffs' pleading to be

inadequate, and Defendants thus urge the Court to dismiss Plaintiffs' Amended Complaint without leave to amend. However, the Court finds that justice would be better served if Plaintiffs were afforded the opportunity to amend their complaint to comply with the PSLRA. Therefore, the Court dismisses Plaintiffs' remaining claims without prejudice and with leave to amend.

The Court warns Plaintiffs that the Court is unlikely to grant Plaintiffs further opportunity to amend. The Court suggests that Plaintiffs consider how their Second Amended Consolidated Complaint could be better drafted than their Amended Complaint. Judge Lindsay's description of the plaintiffs' complaint in *Schiller* is equally apt here: Plaintiffs' Amended Complaint "represents a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint." *Schiller v. Physicians Res. Group*, No. 2:97-CV-3158-L, 2002 WL 318441, at *5 (N.D. Tex. Feb. 26, 2002) (Lindsay, J.).

If they wish to do so, Plaintiffs shall file a Second Amended Consolidated Complaint on or before May 21, 2004. Defendants shall answer or otherwise respond by June 18, 2004. If Defendants file a Motion to Dismiss Plaintiffs' Second Amended Consolidated Complaint, Plaintiffs shall respond within 25 days after the motion is filed, and Defendants shall reply within 15 days after the response is filed. The Court is extremely unlikely to grant any motions, agreed or otherwise, to extend these deadlines.

**SO ORDERED.**

April 26, 2004.

BARBARA M. G. LYNN
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

38